## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **JERMAINE BARNETT,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civ.Act.No. 06-583-JJF |
| | ) | |
| **THOMAS CARROLL**, Warden | ) | |
| and **JOSEPH R. BIDEN III**, Attorney | ) | |
| General for the State of Delaware | ) | |
| | ) | |
| Respondents.[1] | ) | |

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, 28 U.S.C. foll. § 2254, respondents state the following in response to the petition for a writ of habeas corpus:

In August 2005, the grand jury indicted Jermaine Barnett, Hector Barrow, and Lawrence Johnson, charging them with three counts of first degree murder and various other charges relating to the June 25, 1995 shooting of Thomas Smith. *See* Del. Super. Ct. Crim. Dkt. Item 1 in case no. 9506017682 ("Superior Court Docket Item __"). Johnson was tried first; he was acquitted of intentional first degree murder, but convicted of two counts of first degree felony murder. His convictions were affirmed on appeal. *Johnson v. State*, 709 A.2d 1158 (Del. 1998). *See also Barrow v. State*, 749 A.2d 1230 (Del. 2000) (consolidated appeal). In a joint trial, Barrow and Barnett were convicted of intentional first degree murder, two counts of first degree felony murder and other charges. *See* Superior Court Docket Item 140; *Barrow*, 749 A.2d at

---

[1] *See* Fed.R.Civ.P. 25(d)(1). Attorney General Joseph R. Biden, III, assumed office on January 2, 2007, replacing former Attorney General Carl C. Danberg, an original party to this case.

1233.   After a penalty hearing, Barnett and Barrow were sentenced to death.   *See State v. Barrow*, 1998 Del. Super. LEXIS 419 (Del. Super. Ct. February 3, 1998).

On direct appeal, the Delaware Supreme Court reversed the first degree intentional murder convictions of Barrow and Barnett, ordering a new trial on that count.   Against the claim that the admission of Johnson's statement was erroneous, the Delaware Supreme Court affirmed each defendant's convictions for felony murder, concluding that the error was harmless.   The death sentences, however, were vacated.   *See Barrow*, 749 A.2d at 1245.   On remand, the Superior Court conducted a second penalty hearing.   Superior Court Docket Item 240.   On January 4, 2002, the Superior Court sentenced Barnett to life imprisonment for the two first degree felony murder convictions.   Superior Court Docket Item 248; *State v. Barrow*, 2002 WL 88934 (Del. Super. Ct. Jan. 4, 2002).   Barnett did not appeal his sentence.

On January 27, 2005, Barnett petitioned Superior Court for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61.   Superior Court Docket Item 255.   On December 6, 2005, the court denied Barnett's motion as untimely under Rule 61(i)(1).[2]   Superior Court Docket Item 270.   *See also State v. Barrow*, 2005 WL 3436609 (Del. Super. Ct. Dec. 6, 2005). Barnett appealed the denial of his motion for postconviction relief on March 30, 2006.   The Delaware Supreme Court dismissed Barnett's appeal as being untimely.   *See Barnett v. State*, 2006 WL 2371338 (Del. Aug. 14, 2006).

---

[2] Delaware Superior Court Criminal Rule 61(i) provides, in relevant part:  "Bars to Relief.  (1) Time limitation.  A motion for postconviction relief ay not be filed more than one year after the judgment of conviction is final...."

<u>Discussion</u>

In Barnett's original trial, the prosecution introduced out-of-court statements made by Johnson. *Barrow*, 749 A.2d at 1236. In his petition for federal habeas relief, Barnett raises four challenges, all of which are predicated on the admission of Johnson's statement. D.I. 1 at 6-12.

Barnett is not entitled to relief because the claims presented in his petition are untimely under 28 U.S.C. § 2244(d). Because Barnett's petition was filed in September 2006, it is subject to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), signed into law by the President on April 24, 1996. *See generally Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (holding the AEDPA applies to "such cases as were filed after the statute's enactment."); *Lawrie v. Snyder*, 9 F. Supp.2d 428, 433 n.1 (D. Del. 1998); *Dawson v. Snyder*, 988 F. Supp. 783, 802-03 (D. Del. 1997). By the terms of § 2244(d)(1), as amended by AEDPA, a federal habeas petitioner must file the petition within one year of the date on which the state court judgment became final upon the conclusion of direct review. *See* 28 U.S.C. § 2244(d)(1)(A); *Calderon v. Ashmus*, 523 U.S. 740, 742-43 (1998).[3] Barnett's conviction became final on February 5, 2002, the day when the 30 day window to appeal his resentencing to the Delaware Supreme Court expired. *See Lindsey v. Carroll*, 421 F. Supp. 2d 806, 809 (D. Del. 2006) (citations omitted); Del. Supreme Court Rule 6(a)(ii). Accordingly, under § 2244(d)(1)(A), Barnett had until February 5, 2003 to file his petition for habeas relief. Barnett did not file his petition until September 16, 2006, three years, seven months, and eleven days beyond the one year limitations period of § 2244(d)(1)(A).[4] Therefore, the petition is untimely and must be dismissed, unless the

---

[3] Barnett does not allege, nor can respondents discern, any reason to believe that the terms of 28 U.S.C. § 2244(d)(1)(B)-(D) are applicable.
[4] The petition is dated September 16, 2006. D.I. 1, at 16. That is the presumptive date on which Barnett gave the petition to prison officials for mailing. In turn, that date is the date the petition is deemed filed. *See, e.g., Woods v. Kearney*, 215 F. Supp.2d 458, 460 (D. Del. 2002).

time period can be statutorily or equitable tolled.  *See Jones v. Morton*, 195 F.3d 153, 158 (3d Cir. 1999).

In turn, the tolling mechanism of § 2244(d)(1) does not save Barnett's petition from the running of the limitations period.  *See* 28 U.S.C. § 2244(d)(2).  When applicable, § 2244(d)(2) tolls the one-year period of § 2244(d)(1) during the time that a properly filed state postconviction action is pending in the state courts.  While Barnett may have filed for state postconviction relief, he did not do so until after the one year statute of limitation period of § 2244(d)(1) had run.  As a result, his filing neither reset nor revived the limitations period.  *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *Woods*, 215 F. Supp.2d at 462 (citing cases); *Spencer v. Snyder*, 2002 WL 1774234, at *2 (D. Del. July 24, 2002) (citing cases).[5]  Accordingly, Barnett's petition is thus untimely under section 2244(d) and must be dismissed.

Of course, as the Court has repeatedly noted, the limitation period might be subject to equitable tolling.  *See, e.g., Thomas v. Snyder*, 2001 WL 1555239, at *3-4 (D. Del. Nov. 28, 2001) (describing rule).   Equitable tolling, however, applies only where the petitioner "has in some extraordinary way been prevented from asserting his or her rights."  *Miller v. New Jersey State Dep't of Corrections*, 145 F.3d 616, 618 (3d Cir. 1998).  Here, Barnett has failed to allege or demonstrate any extraordinary circumstances that prevented him from filing his petition with the Court in a timely manner.  Indeed, Barnett cannot credibly allege that the substance of his legal argument or the foundational facts were unavailable to him during the limitations period; in

---

[5] Furthermore, when Barnett finally petitioned for postconviction relief, the Superior Court denied it as untimely under Rule 61(i)(1).  *See Barrow*, 2005 WL 3436609 , at *2.  Similarly, the Delaware Supreme Court dismissed Barnett's appeal of the order denying his postconviction motion as untimely under its Rule  6(a)(iii).  Because Barnett's motion for postconviction relief was not properly filed, the motion and the ensuing appeal each being untimely, it would not have statutorily tolled the one-year limitations period under § 2244(d)(1).  *See Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005).

fact, at the end of his direct appeal, Barnett had all the information upon which he relies in the instant petition. Furthermore, equitable tolling requires diligence on the part of the petitioner. *Miller*, 145 F.3d at 618-19. Barnett's delay of more then three years and seven months does not reflect any degree of diligence on his part. Accordingly, the petition is untimely under § 2244(d), and there is no basis upon which any relevant time should be excluded by virtue of the equitable tolling doctrine.

## Conclusion

Based upon the Superior Court docket sheet, it appears that transcripts of Barnett's trial and sentencing proceedings have been prepared. In the event that the Court directs the production of any transcript, respondents cannot state with specificity when such transcript would be available. However, respondents reasonably anticipate that such production would take 90 days from the issuance of any such order by the Court.

For the foregoing reasons, the petition for writ of habeas corpus should be dismissed without further proceedings.

/s/Kevin M. Carroll
Kevin M. Carroll
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 4836
Kevin.Carroll@state.de.us

Dated:  February 2, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2007, I electronically filed the attached documents with the Clerk of Court using CM/ECF. I also hereby certify that on February 2, 2007, I have mailed by United States Postal Service, the same documents to the following non-registered participant:

Jermaine Barnett
SBI No. 330792
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

/s/ Elizabeth R. McFarlan
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 3759
elizabeth.mcfarlan@state.de.us

Date: February 2, 2007

LEXSEE 1998 DEL. SUPER. LEXIS 419

**STATE OF DELAWARE, Plaintiff, v. HECTOR S. BARROW, and JERMAINE BARNETT, Defendant.**

**Cr. A. Nos. IN97-02-1353, IN97-02-1356 and IN97-02-1359, Cr. A. Nos. IN97-02-1328, IN97-02-1331 and IN97-02-1334**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

**1998 Del. Super. LEXIS 419**

**August 1, 1997, Submitted**
**February 3, 1998, Decided**

**SUBSEQUENT HISTORY:** [*1]

Released for Publication by the Court November 9, 1998.

**DISPOSITION:**

Sentence to be imposed as to Defendants Barnett and Barrow as to Counts I, IV and VII shall be death by lethal injection.

**COUNSEL:** Mark Bunitsky, Esquire and Donald R. Roberts, Esquire, Deputy Attorneys General, Wilmington, Delaware, Attorneys for the State.

Anthony A. Figliola, Jr., Esquire, Wilmington, Delaware and Sheryl Rush-Milstead, Esquire, Wilmington, Delaware, Attorneys for Defendant Barrow.

Jerome M. Capone, Esquire, Wilmington, Delaware and Thomas A. Foley, Esquire, Wilmington, Delaware, Attorneys for Defendant Barnett.

**JUDGES:** CHARLES H. TOLIVER, Judge.

**OPINION BY:** CHARLES H. TOLIVER

**OPINION:**

FINDINGS AFTER PENALTY HEARING

TOLIVER, Judge

PROCEDURAL POSTURE

On June 25, 1995, Tom Smith, co-owner of Black Sheep Sports, a business involving the buying and selling of firearms, was killed during the robbery of that store. Arrested shortly thereafter were Jermaine Barnett, Hector Barrow, and Lawrence Johnson, all from New York City, New York. Each was initially indicted by the Grand Jury on August 7, 1995 and charged with having committed Murder First Degree/Intentional, Murder First Degree/Felony-Recklessness, Murder [*2] First Degree/Felony-Criminal Negligence, Robbery First Degree, Burglary Second Degree, Conspiracy First Degree, Conspiracy Second Degree and Possession of a Firearm During the Commission of a Felony. n1

> n1 Barnett and Barrow were reindicted on February 18, 1997 for reasons unrelated to the legal viability of the original indictment. Barnett was charged with a total of twenty-one offenses. Barrow was charged with twenty-four offenses because of three additional charges, two counts of Forgery Second Degree and one count of Criminal Impersonation, that were not lodged against Barnett.

Because the State indicated its intention to seek the death penalty as to the murder charge, 11 Del. C. § 4209, which sets forth the procedure and standards governing the issue of capital punishment, became applicable. In short, if a defendant is found guilty of Murder First Degree, the statute requires that a further hearing, a penalty phase, as it is more commonly known, be conducted. At such a hearing, the only issue to [*3] be determined is whether the defendant is to be sentenced to life without the possibility of probation, parole or other form of sentence reduction, or whether the death penalty will be imposed. Each party is required to provide notice to the other party or parties of any aggravating or mitigating factors upon which that party will rely. § 4209(c)(1). At the conclusion of the hearing, the jury must recommend to the Court:

1. Whether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance as enumerated in subsection (e) of this section; and

2. Whether, by a preponderance of the evidence, after weighing of all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

A report of the jury vote as to each question must be provided to the Court. § 4209(c)(3). While it is entitled to great weight, the Court is not bound by that vote, and in fact, may reject it completely. Lawrie v. State, Del. Supr., 643 [*4] A.2d 1336, 1346 (1994).

After considering the jury's recommendation, the Court must impose a sentence of death if it too finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists, and, by a preponderance of the evidence, that any aggravating factors present outweigh any existing mitigating factors. Otherwise, a defendant must receive a life sentence. If the death penalty is imposed, written findings setting forth the basis for that decision must be rendered. § 4209(d)(1 - 3).

Trial of the charges against Barnett and Barrow began on April 17, and concluded on May 15, 1997. n2 The jury found the Defendants guilty as charged. As required by § 4209(c)(1), counsel for the State and the Defendants provided the notice of the factors in aggravation and mitigation on May 15 and 16. The penalty phase commenced on May 20 and ended on May 28. The jury found the existence of at least one statutory aggravating factor in that both Defendants had been found guilty of having committed murder during the course of a robbery and/or a burglary in violation of 11 Del. C. § 636(4) & (6). It then went on to conclude, by a vote of 8 to 4 as to both Defendants, [*5] that the aggravating factors outweighed any mitigating circumstances thereby recommending that the Court impose the death penalty.

n2 Mr. Johnson was tried separately from November 18, 1996 to December 12, 1996. The use of "Defendants" herein, unless otherwise noted, refers only to Barnett and Barrow.

After due deliberation, the Court has determined that each Defendant must be sentenced to death. That which follows are the written findings required by § 4209(d)(3) based upon the record following the trial, penalty phase and post-trial submissions.

FACTS

The Crime

At approximately 4:44 p.m. on June 25, two individuals telephoned the emergency assistance or "911" operator to report what they believed to be a possible robbery. The witnesses described three black males wearing baseball caps who appeared to be attempting to illegally enter Black Sheep Sports. One individual ultimately determined to be Johnson, remained outside as the "lookout", while Barnett and Barrow, went inside. While the two [*6] were inside, one witness described a noise that she assumed was a car "backfiring." It was at that point that the lookout left his vantage point and went to the entrance of the shop to meet the other two. n3 After a brief interlude, the witnesses watched as the three males exited that establishment carrying a large brown bag. They began to travel in the direction of a local pizza shop and the Lancaster Court Apartments. Partial descriptions of what the males were wearing were provided to the police.

n3 It remains unclear whether Johnson actually entered the building at this time, but it is clear that he changed locations after the noise in question.

This was not the first occasion that the three were seen on June 25 at or around Black Sheep Sports. A short time prior to their actual entry, these same three individuals had arrived at that location and walked around the building before leaving. The witnesses became suspicious when they returned, this time with the aforementioned brown bag.

When the police arrived [*7] at the scene, they entered Black Sheep Sports only to find Tom Smith dead. He had been shot in the back of the head "execution style", i.e., at close range, from approximately two to eighteen inches. It was readily apparent that Mr. Smith fell where he was shot and died instantly. There were no signs of forced entry, a struggle or resistance although the inside of the store had been ransacked. Handguns, ammunition and money were taken.

As the Defendants left the premises, they continued to be observed by the witnesses who initially reported them. They travelled with their booty behind a strip shopping center and on to the Lancaster Court Apart-

ments. In the process, they were further observed and even spoke to additional witnesses who also provided police with that information.

Upon entering the apartment complex, the trio went to Building 2 and entered Apartment 2C. Barrow entered first and dumped the guns he was carrying in a chair. Johnson and Barnett followed with the large brown bag also containing guns and went into the bedroom. They were followed by Barrow and two or three other occupants of the apartment. The weapons taken were displayed amidst celebration and congratulatory [*8] gestures ("high fives") on a job well done. It was in the midst of these festivities that Barrow gleefully exclaimed "I shot the bomba cloth", n4 apparently referring to Tom Smith. Unfortunately for Messrs. Barnett, Barrow and Johnson, the euphoria did not last long as the police, based upon the information provided by witnesses, arrived at and began to secure Building 2.

n4 "Bomba cloth" is Jamaican slang for a used feminine hygiene product.

When the occupants of Apartment 2C became aware of this turn of events, warnings were shouted, and attempts were made to change clothing and exit the building. Two individuals who apparently did not directly participate in the events at Black Sheep Sports, Andrew Austin n5 and a female companion, were able to exit before the police completely cordoned off the building. Barrow was taken into custody shortly after the police arrived but before the search of Building 2. Johnson was apprehended in Apartment 2C feigning sleep and was removed along with another occupant of [*9] the apartment, Dennis Thomas. Mr. Thomas was not linked to the robbery. Barnett remained in the apartment, hiding in a closet, but was stopped shortly thereafter attempting to leave the building.

n5 The exact nature of Mr. Austin's connection with the occupants of Apartment 2C or why he was there was not readily apparent.

Barnett, Barrow and Johnson, along with others at or near the scene, were questioned as to who they were and what they were doing in Building 2. While Johnson gave the police his correct name and address, Barnett gave at least two false identifications before his true identity was determined based on fingerprint evidence and his past criminal history. Barrow's identity was determined as a result of documents found in Apartment 2C notwithstanding his attempt to provide misleading information.

It was also discovered that Barrow and Johnson were cousins.

After Building 2 was completely vacated, a search warrant was obtained and executed by police. Secured were over thirty handguns, ammunition [*10] of various types, a brown bag in which some of the guns along with other items of personalty from Black Sheep Sports were found. Among the weapons was a Rossi .38 caliber revolver that was later determined through testing to have been the gun from which the shot that killed Tom Smith was fired. n6 In addition, the officers found the documents identifying Barrow along with items of clothing appearing to have been associated with those who were described as the perpetrators of the crime. n7

n6 A review of the records of Black Sheep Sports by officials of the Bureau of Alcohol, Tobacco and Firearms resulted in the conclusion that this weapon was not one of the ones taken in the robbery. Further research determined that it had been among items taken during the course of a local burglary committed in May, 1995.

n7 Of note is the fact that gloves were found inside Apartment 2C which contained residue resulting from handling a firearm during and shortly after its discharge. No residue was found on the hands or clothing of either Defendant. This evidence is to be viewed in conjunction with the testimony of one of the initial witnesses, Pat Johnson, who saw a participant other than Johnson, enter Black Sheep Sports wearing gloves.

[*11]

Apartment 2C was leased in the name of Christine Edwards, the aunt of Dennis Thomas. Prior to June 25, only Barrow had visited the apartment. Approximately one month before that date, it appears that he may have come to see Ms. Edwards. Barnett and Johnson appeared on June 23, the Friday before Tom Smith's death. In any event, the next day, Saturday, June 24, Barrow and Andrew Austin asked Dennis Thomas to purchase ammunition for them because they lacked proof of identification. Thomas agreed and accompanied them to Black Sheep Sports where Barrow and Austin specified the type of ammunition (.38 caliber) and supplied the money to pay for the same.

As of Sunday morning, June 25, present in Apartment 2C were Thomas, Austin, Austin's female companion, Barnett, Barrow and Johnson. At some point during the course of the afternoon, Barnett, Barrow and Johnson left on their first foray to Black Sheep Sports. Upon their

return to the apartment, they remained for approximately fifteen minutes before leaving again, this time to commit the instant offenses. It was prior to this second departure Barrow was heard to say that Mr. Smith was asleep and that the door was open.

Other than to perpetrate [*12] this crime, no evidence was presented which would explain why Barnett and Barrow were in Delaware on June 25. n8 There was no indication that either was employed. Based upon the evidence presented, the Court must conclude that the purpose of the trip was to obtain handguns for later resale and/or distribution in their home state of New York. That state, it seems, has laws relating to the purchase of such weapons that are more restrictive than those of Delaware. New York's laws also account for the two to threefold increase in value that handguns obtained elsewhere bring in New York.

n8 Johnson's only connection was Barrow. Barnett, on the other hand, did have an uncle in this state. That uncle, Lawrence Barnett, was in prison at the time of the trial but apparently was not on June 25. If there was a connection between Barnett and his uncle on that date, it was not established at trial.

Tom Smith

At the time of his death, Tom Smith was fifty-eight years old and had been employed by NVF, a local manufacturing [*13] concern, for twenty-three years. Black Sheep Sports was a concern that he co-owned with his brother. However, they were getting out of the gun trade when he was killed because of the difficulties inherent in the business.

In addition to his job and business, Mr. Smith was a highly regarded and well liked member of the Hockessen Volunteer Fire company. He preferred to serve as an emergency medical technician, answering approximately three hundred or more calls annually and took such extra care with patients that he was referred to as "Dr. Tom." Moreover, his knowledge and expertise were such that he taught courses on the subject. He worked with the Girl Scouts and acted as a host for exchange students.

Mr. Smith had been married and divorced twice, and was the father of an adult daughter. Notwithstanding the divorces, Mr. Smith remained very friendly with his former wives. He was also extremely close to his only child with whom he was quite active and spent a lot of time both during her youth and as she became an adult. They have and will miss him, particularly his daughter

whose upcoming wedding and planned return to college he will not be able to share. Considered outgoing and personable, [*14] he never seemed to be disagreeable and worked well with younger members of the fire company. Mr. Smith was also very protective of family and friends. His loss to them is obviously very great.

Hector Barrow

At the time of this offense, Barrow, age twenty-three, was single and the father of at least one child, a daughter, and possibly a son. His mother is deceased and little is known of his father except that he might have been abusive to Barrow in the past. He has one sister with whom he has a close relationship. Although there was no evidence he was employed on the date of the instant crimes, he had worked in the past in retail or sales type jobs. The balance of the picture painted of this Defendant represents a paradox.

His mother died under mysterious circumstances during his youth leaving him and his sister as survivors. Her death was never explained nor was anyone brought to task as a result of her death. It is argued that this had a great effect upon his personal development. On the other hand, Barrow has been described as caring and responsible. Prior to his arrest, he was active in the support of his daughter, both emotionally and financially. His execution would [*15] be considered a great loss as well as a hardship to his family.

There have been no disciplinary problems thus far during his imprisonment. To the contrary, Barrow has participated in an educational program as mentor and senior advisor to the younger program participants. He oversees a group of approximately eleven persons. He is well thought of and is considered fair. People want to be in his group. There is nothing to indicate that he could not continue to contribute in such a positive manner.

There is no history of drug or alcohol abuse. Nor is there any evidence of psychosis or antisocial personality. Barrow is not considered a present danger to others and there is no evidence of impaired thinking. Equally absent is anything which would explain the events of June 25, 1995. Any anger he feels is generally directed inward and he knows right from wrong. During the course of his allocution before the jury, Barrow attempted to express regret over what happened. However, he continued to deny any involvement in the offenses in question notwithstanding the evidence presented during the trial and the jury's verdict.

Jermaine Barnett

On the date of Tom Smith's death, he was twenty-three [*16] years old, single and did not have any children. His immediate family consisted of his mother, one

1998 Del. Super. LEXIS 419, *

brother and two sisters. He is the oldest child. Like Barrow, little is known of his father. What is known however, is that he had a horrific childhood.

More specifically, Barnett was born while his mother, now known as Jennifer Barnett Brown, was in high school. His grandparents were very strict. When his mother became pregnant with Barnett's brother, Juan, she was put out of the home to fend for herself and the two boys. At various times following that separation, she was a prostitute, a drug addict and was subjected to numerous arrests. She was abused physically as well as sexually. She in turn abused her sons. Married at least once to someone other than Barnett's father, Ms. Brown had two additional children, both girls. There was little supervision because of her lifestyle. Simply put, she didn't want the children around to interfere with her adult male relationships.

To add to his woes as a child, Barnett was severely injured when he fell out of a window during the course of a stay with his mother. He broke his hip, several ribs and suffered other injuries. During the period of [*17] rehabilitation which followed, Barnett had to wear braces and was the subject of derision by other children. It was also following this incident that he was placed in foster care.

Ultimately, because the living conditions were so extreme, the grandparents took Barnett back to live with them. The quality of life improved for him while he lived with them and at least two uncles who also resided there. However, when his grandfather died at a relatively young age, the family fortunes went downhill. He was introduced to crime by an uncle who assumed the role of a father figure to Barnett. n9 There was not always enough to eat and everyone had to fend for themselves.

n9 This uncle, the same Lawrence Barnett referred to in Footnote 8, testified at trial as to how he taught Barnett to commit crimes and abuse alcohol starting at age thirteen. It further appears that he had a similar impact on Barnett's younger brother who also testified at trial and was then an inmate in the federal prison system.

Barnett's criminal [*18] history consists of two robberies. The first took place in New York City, New York in 1990. The second occurred in 1991 in Rochester, New York. It involved the use of a weapon by Barnett in an attempt to rob an alleged drug dealer. He received prison sentences for both offenses. There is no information as to exactly what Barnett did for a living upon his release. Indeed, the record is eerily silent concerning whether Barnett was ever legitimately employed.

Barnett possesses above average intelligence, but did not do as well as might be suggested in school. This has been attributed, as has his criminal past, to the effect of his family history and development as a child. It influenced his responses to situations as well as how he viewed himself. However, there is no suggestion that he was suffering from a mental illness or deficiency. At one point, Barnett, at least according to his brother, desired to be a doctor. That interest obviously waned in the face of the economic and social reality with which he was faced.

Notwithstanding their troubles, it is readily apparent that his family sincerely cares about Barnett. Equally obvious is the impact his execution would have upon them, [*19] particularly his mother. In short, it would be catastrophic given the multitude of tragedies which have already befallen them and they urge this Court to spare his life. For his part, Barnett has expressed sorrow at the grief that the Smith family has suffered but said little else of consequence during his allocution.

DISCUSSION

The Court has reviewed the evidence and considered the recommendation of the jury to impose a sentence of death by an 8 to 4 vote. Having done so, and as pointed out above, it must still determine independently whether at least one statutory aggravating factor exists. If the answer is in the affirmative, like the jury, the Court must weigh the relevant evidence in mitigation and aggravation relating to the offender as well as the offense.

Aggravating Circumstances - Statutory

The State has alleged as the requisite statutory aggravating factors as to both Defendants that the murder of Tom Smith took place during the commission of robbery and/or burglary in accordance with § 4209(e)(1)(j). This factor was established beyond a reasonable doubt by virtue of the conviction of the Defendants of crimes set forth in Count IV (Murder First Degree/Felony-Criminal [*20] Negligence) and Count VII (Murder First Degree/Felony-Recklessness). Against Barnett alone the State has alleged the existence of a prior felony conviction involving the use of, or threat to use, force or violence against another person in accordance with § 4209(e)(1)(i). The testimony presented at trial demonstrated that Barnett was convicted of two robberies, at least one of which involved the use or threatened use of a firearm. This evidence was undisputed and establishes beyond a reasonable doubt the existence of a second aggravating factor as to Barnett. The Court must therefore go on to compare the statutory and any nonstatutory aggravating circumstances, if any, versus any mitigating circumstances that might be said to exist.

Aggravating Circumstances - Nonstatutory

The nonstatutory aggravating factors alleged by the State to exist are the same for both Defendants and fall into three categories. n10 The first involves the manner in which the crime was committed, i.e., unprovoked and with premeditation. The second category concerns the purpose of the crime. The State has alleged that it was carried out to facilitate the acquisition of weapons for illegal sale and [*21] distribution. It was also carried out to silence the sole witness to the taking of the guns. The final category addresses the impact of the crime. It includes the impact on Tom Smith and his family, the involvement of a sixteen year old juvenile as a participant and the lack of remorse of each Defendant for his part in the crimes in question. The Court finds that the State has met the requisite burden of proof and established the existence of these factors by substantial and reliable evidence. See State v. Manley & Stevenson, 1997 Del. Super. LEXIS 5, *43, Del. Super., I. D. Nos. 9511007022 & 9511006992, Barron, J. (January 10, 1997) (Findings After Penalty Hearing).

n10 Specifically, the State indicated that it intended to rely on the following nonstatutory aggravating circumstances with regard to both defendants:

1. The murder was an unprovoked, cold blooded, killing of a person, who, at the time, lacked the ability to defend himself, solely for pecuniary gain;

2. The murder was pre-meditated and the result of significant planning;

3. The murder was committed in order to avoid detection and to silence a witness;

4. The murder was committed for the purpose of obtaining handguns that would ultimately have been sold and used for illegal purposes;

5. The defendant[s] solicited the assistance of Lawrence Johnson (DOB 10/12/78), a sixteen (16) year old juvenile co-defendant, who as a result of this crime, is now serving two life sentences;

6. The defendant[s] lacked remorse for the murder at or near the time of the offense; and

7. Victim impact.

As to Barnett alone, the State indicated that it intended to introduce evidence of the facts and circumstances surrounding crimes of which he had been previously convicted.

[*22]

In terms of the manner of the crime, it is clear that the Defendants preplanned at least to rob Black Sheep Sports and were prepared to overcome any resistance by its proprietor. At least one visit was made the day before to purchase ammunition of the caliber that was used to kill him. A second visit took place on June 25 and revealed that Mr. Smith was asleep and the premises were unlocked. Moreover, there is no evidence that any of the perpetrators had any substantial reason for being in Delaware other than to commit these offenses. Finally, while there was no direct evidence of an advance agreement or plan to kill Mr. Smith, the fact that he was killed "execution style" absent any signs of struggle or resistance supports at least the proposition that his death was unprovoked, if not an intended product of the overall conspiracy.

Equally apparent is the fact that the ultimate goal of the robbery of Black Sheep Sports was to obtain handguns for subsequent sale and/or distribution elsewhere, presumptively in New York, from which Barnett, Barrow and Johnson all hailed. Stated differently, Black Sheep Sports was robbed to make money. This conclusion is inescapable and is exacerbated [*23] by the fact that the guns would more than likely be used to commit other offenses. Otherwise, there would be no reason to buy such a weapon at two to three times its worth. Moreover, it is reasonable to conclude that Mr. Smith was killed to avoid later identification or apprehension. That conclusion is supported by the facts that none of the perpetrators wore disguises and at least Barrow had been there the day before.

The final category of aggravating circumstances concerns the impact of the death of Tom Smith. This category includes both victims and perpetrators.

The loss to Tom Smith's family, particularly his daughter is obvious. She will face some of the most significant events of her life without the first man in her life, her counselor and friend. His loss has been keenly felt by other members of his family as well as his former spouses with whom he remained close. Finally, there is

the loss to the community. Mr. Smith was a selfless volunteer whose interests and activities ranged from working with Girl Scouts to hosting foreign students to fire safety and emergency medical care. He was a pleasant and positive influence on others at work, in the community and within his own [*24] family. His loss has been and will be keenly felt by all those whose lives he touched.

Tom Smith's death also impacted on Johnson, the sixteen year old juvenile who was involved. As a result of that involvement, he is now serving two consecutive life terms and one hundred and twenty-six years. Prior to June 25, his only involvement with the criminal justice system was a truancy charge.

Lastly, there is the impact, or lack thereof, of that homicide on Barnett and Barrow. As the State points out, both expressed very little or no remorse at or near the time of the offense. Both were involved in a celebration of what they then thought was the successful completion of the robbery of Black Sheep Sports which included the murder of Tom Smith. Neither expressed any surprise, revulsion or disdain over his death. Indeed, Barrow gleefully claimed responsibility for that tragic act. That celebration the Court must conclude, presents a truer picture of remorse, or the lack thereof, than the statements made during the course of their respective allocutions after guilty verdicts had already been rendered.

Mitigating Circumstances - Both Defendants

Both Defendants have relied upon numerous [*25] circumstances in mitigation of the crimes committed on June 25. Both cite their age on that date as a factor militating against the imposition of the death penalty. The Court agrees that this is a factor which has been established by the requisite standard and may be so considered. n11 However, their arguments diverge dramatically from that point, and must be viewed separately as a result.

n11 It would be difficult to dispute the age of the Defendants or that it has been established by the evidence.

Mitigating Circumstances - Barnett

Barnett lists ten factors which he argues should be taken into account in his favor. n12 The Court finds that seven have been established by the evidence, and may be segregated into three groups. They concern the hardships he experienced emotionally and physically, the lack of positive direction from the adults to whom he looked for guidance and the effect his execution would have on surviving family members. The existence of the others simply has not been established [*26] or has been negated by the jury verdict. n13

n12 Barnett provided notice that he intended to rely on the following factors at the penalty hearing:

1. Defendant Barnett's age/youth at the time of the offense;

2. Defendant Barnett was the product of a terrible childhood, abused, abandoned, and neglected by both his parents;

3. Defendant Barnett never had a parent who served as a positive role model;

4. Defendant Barnett was constantly uprooted, and placed in various households, which denied him a true sense of security;

5. Defendant Barnett was physically handicapped until age 8, and often the target of humiliation by peers;

6. As a youth, Defendant Barnett's adult role models, whom he trusted, introduced Barnett into criminal activity;

7. Defendant Barnett's substance abuse problems contributed to his downfall;

8. The devastating impact of a death sentence upon Defendant Barnett's family and his loved ones;

9. Defendant Barnett's desire and capacity to better himself;

10. Residual doubt about Defendant Barnett's role in the offense.

n13 There was little or no evidence of Barnett's desire or capacity to better himself. There was some evidence that he had participated in one program since his incarceration, but no explanation was provided as to its long term benefit to him or others. In addition, the Court is unaware of any indication that substance abuse by Barnett played any role in the instant crimes. Also absent is any evidence indicating that Barnett was involved in the abuse of drugs or alcohol at any point in time even remotely close to June 25, 1995. And, at least in the Court's mind, there is no residual doubt about Barnett's role in the events of June 25 based upon the jury's verdict.

[*27]

As discussed above, Barnett's childhood was problematic at the very least. Physical and emotional abuse, from his mother among others, were the constants in his life. n14 He was separated from his mother and siblings at an early age and was raised in foster homes before being taken in by his grandparents. Even the return to his extended family soured given the poverty, characterized by hunger and premature emancipation, that followed his grandfather's death.

n14 Less it be forgotten, Barnett's mother, and possibly Barnett himself, were blamed by his maternal grandmother for contributing to his grandfather's death due to his concern over their chaotic lifestyle. In addition, it should be remembered that Barnett was subjected to emotional abuse by other children because of the physical handicaps he experienced while recovering from a severe childhood accident.

Nor does there appear to have been any positive adult influence while he was growing up other than his grandparents. Unfortunately for him, his grandfather [*28] died prematurely and his grandmother was unable to cope with the resulting burden. There is no evidence of any involvement by his biological father. His mother was a drug addict and emotionally troubled, and his uncles were dysfunctional at best. At least one of them introduced him to crime and substance abuse as rites of passage into adolescence. To say that these factors along with the conditions of his rearing had an impact upon how and why Barnett reacted to events in his life prior to June 25, is an understatement.

The last factor to be considered is the impact on Barnett's family if he were to be executed. Simply put, the loss would be keenly felt by his family. His mother, whose life is on the rebound, would be devastated. The other members of his family would be similarly traumatized.

Mitigating Circumstances - Barrow

Barrow indicated that he intended to rely on six mitigating circumstances. n15 Each of those factors have been established by the evidence, and essentially fall into two categories. The first one relates to this Defendant's character, past and present. The second concerns his potential for positive contribution and the effect his execution would have [*29] on others, including his family and friends.

n15 Those circumstances were set forth as:

1. Defendant Barrow's age/youth;

2. Defendant Barrow has no prior juvenile or adult criminal history;

3. The devastating impact of a death sentence upon Defendant Barrow's family and loved ones;

4. Defendant Barrow has made a positive adjustment to imprisonment;

5. Defendant Barrow's desire to better himself;

6. The impact on Defendant Barrow of the death of his mother, including the fact that the circumstances surrounding her murder were never explained nor was the crime solved.

One of the greater anomalies of this case is that prior to June 25, 1995, there is no indication that Barrow had any formal contact, either as a juvenile or as an adult, with the criminal justice system here or in New York. Nor has he experienced any conflict with discipline within the institution where he has been incarcerated since the aforementioned date. To his credit, Barrow has been a leader and model [*30] prisoner, contributing to the welfare of others through his role in educational programming provided within the institution.

Similarly, the evidence introduced predicts that this Defendant would continue to aid others. This would include those within the institution and his family who

continue to visit him. Conversely, his execution would devastate his family and deprive at least his daughter of her father before he could have a substantial impact on her life.

The last mitigating circumstance to be considered is the effect of the unexplained death of his mother on Barrow. It obviously had to, and did, have an impact on him. It was after this event that a change was noticed in the Defendant.

Weighing of Aggravating & Mitigating Factors

The Delaware Supreme Court has stated that this process is not a mathematical process, but involves a reasoned and deliberative judgment of the facts and circumstances of each case before determining the appropriate punishment. Specifically, the Court stated:

> The procedure to be followed by the trial judges . . . is not a mere counting process of x number of aggravating circumstances and y number of mitigating circumstances, but rather [*31] a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present.

Delaware v. Cohen, Del. Supr., 604 A.2d 846, 849 (1992) (citing State v. Dixon, Fla. Supr., 283 So. 2d 1, 10 (1973)).

As the preceding discussion indicates, both Defendants have established the existence of circumstances in mitigation of the instant offenses. In Barnett's favor are his dysfunctional family and childhood. There is also the fact that the evidence points toward Barrow as the one who actually fired the weapon that killed Mr. Smith. Barrow has established his lack of a prior criminal record, his positive adjustment in prison and the traumatic impact that his mother's death had on him. In addition, both Defendants are young with presumptively long lives ahead of them unless one or both were sentenced to death. If that penalty were to be imposed, each would be missed by their respective families and/or loved ones. Regrettably, the Court must conclude that these factors are outweighed by the existence of those factors in aggravation of the offenses in question. This conclusion [*32] is based on several factors, some of which relate to both Defendants, and some relate to only one of them.

First, the crimes which resulted in the death of Mr. Smith were initiated for the purpose of obtaining handguns for later sale and/or distribution. Hence, the Court must conclude that the crimes were committed for pecuniary gain. Further, because those weapons were obtained illegally, ownership thereof could only be transferred in the same manner. Logic and common sense would cause one to conclude that any weapon so acquired is likely to be used in further crimes or in some manner not normally contemplated by law abiding citizens. It is the kind of crime which does not end on the date of its commission, but continues to take an undeterminable toll beyond the foreseeable future. Perpetrators of such crimes, which would include both Defendants, must be viewed and dealt with more harshly.

Second, prior planning, including the purchase of ammunition the day before the crimes took place, demonstrates a predisposition for violence, if not an intent to kill or harm someone by Barnett and Barrow. To understand this one need simply consider the purchase of ammunition the day before the [*33] crime, the fact that a handgun used to kill Tom Smith was stolen earlier from a local resident and the use of gloves by at least one of the two who went inside Black Sheep Sports on June 25. To add additional insult, the only known purpose of each of the Defendants in being in Delaware was to commit crimes against its citizenry.

Third, there is the callousness of the crime. This is illustrated by the celebration, complete with "high fives" and claims of responsibility for killing Tom Smith, following the final return of the Defendants to Apartment 2C on the date of the instant crimes. Equally supportive is the lack of any evidence of victim involvement in those crimes. The murder was "execution style"; there were no signs of resistance or struggle by Mr. Smith. Both the manner in which he was killed as well as the celebration that followed evidence an extreme indifference to life.

Fourth, Barnett, in addition to the factors which apply with equal force to he and Barrow, has to be viewed in light of two prior robberies. Again, at least in one of them Barnett was armed and used or threatened the use of force. The time served in prison for both offenses apparently had no effect given [*34] the fact that the three offenses and the prison terms imposed for the first two all took place within a five year period, from 1990 to 1995. n16

> n16 Interestingly enough, no evidence was introduced concerning what, if any, rehabilitative efforts Barnett underwent during his New York incarceration. Nor was there any evidence put forth relative to how he behaved, i.e., his disciplinary record, while in that system.

Finally, while Barrow had no prior criminal record, it must be remembered that it was he who claimed responsibility for killing Mr. Smith. He also brought a sixteen year old juvenile into the conspiracy. That juvenile, Lawrence Johnson, was his cousin and had no previous negative encounters with the law other than a truancy charge. Mr. Johnson will now have to spend the rest of his life in jail unless he is successful on appeal. In effect, Barrow has the destruction of two lives, Tom Smith and Lawrence Johnson, for which to account.

The age and trauma suffered during their respective childhoods do [*35] not change the result reached here. It does not lessen the severity of the offenses, and, indeed, may exacerbate them. Given the cruelty and purpose of the crime, one would shudder to think what they might be capable of in later years had they not been apprehended this time. Nor do these factors lessen the loss to Tom Smith and those who cared about him. The Defendants' families will suffer as well, but the responsibility for that loss must rest upon each Defendant, not society as a whole.

The Defendants have argued in one form or fashion that the Court should not impose a sentence of death where one third of the jury has in effect voted to impose imprisonment for life. n17 However persuasive that may sound at first glance, it ignores the fact that the General Assembly, in enacting 11 Del. C. § 4209 in its present form, limited the role of the jury to making a recommendation to the presiding judge as to the penalty to be imposed. n18 Obviously, the General Assembly felt that the final decision as to the penalty to be imposed in each case should be left to the discretion of the Court given the circumstances then existing.

n17 Barnett has argued that since this judge did not impose the death penalty in State v. Baker & Dickerson, Cr. A. Nos. IN90-12-1038 thru 1041, Toliver, J. (July 14, 1992) (Sentencing Dec.); where the jury recommended that the death penalty be imposed by a vote of 9 to 3, it should not be imposed herein. That case, as counsel should be aware, is distinguishable on its own facts generally, and in particular, with regard to the age of Dickerson, the drug addiction of Defendant Baker as well as their association with the victim and his alleged involvement with illegal drugs.

[*36]

n18 In order for the jury to have a larger role, the General Assembly must amend § 4209 to mandate the imposition of the death penalty only

where the jury recommends it by a vote that exceeds a certain percentage of the twelve votes cast at the conclusion of the penalty phase. However, it is doubtful that this argument would be made if the jury vote were 10 to 2 or 11 to 1 in favor of the death penalty. Rather, there is little doubt that counsel would be arguing that the Court should ignore such a strong recommendation by the jury and adopt a different view.

To the extent that it may be argued that both Defendants do not deserve the death penalty because only one person fired the shot which killed Tom Smith, that argument is not persuasive. It ignores the fact that both Defendants went inside Black Sheep Sports as part of a common scheme or plan. Both carried guns out of that establishment. Both were inside when the fatal shot was fired. And, although Barrow admitted being the shooter during the post-robbery celebration, the evidence at trial suggests that Barnett gave no indication that [*37] he was anything but pleased with the results of their mutual effort during that same celebration. Stated differently, there is no evidence that he complained about, was frightened by or did anything other than ratify what took place inside Black Sheep Sports that day. Moreover, Barnett has a criminal past involving violent crimes and weapons. Finally, the jury viewed them, by virtue of their 8 to 4 vote in favor of the death penalty as to each, as equally culpable. For these reasons, both Defendants should receive the same punishment. n19

n19 Because both Defendants were major participants whose mental states showed at the very least a reckless indifference to human life, neither can complain that the imposition of the same punishment violates Enmund v. Florida, 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982) and Tison v. Arizona, 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676 (1987). Compare State v. Rodriguez, Del. Super., 656 A.2d 262 (1993).

In imposing these sentences, the Court makes [*38] no statement concerning the death penalty as a necessary tool in the administration of justice. That decision was made some time ago by the Delaware General Assembly. The role of this Court is to carry out the laws as formulated by that body, which is what has been attempted here. Again, there is nothing in the record to indicate that the death of Tom Smith was the product of impaired thinking, whether externally induced by drugs or alcohol, or that it was the result of some recognizable mental infirmity existing in one or both of the Defendants. Mr.

Smith did nothing wrong other than to open up for business on June 25, 1995. The best that can be said is that this was a cold blooded killing which occurred during the course of a planned effort to commit a crime. Whether Mr. Smith was murdered to silence the only direct link between the Defendants and the robbery, or for some other reason, the Defendants knew there was a possibility that they would need to resort to violence to carry out their plan. They did and Tom Smith is dead. Consequently, if there is to be capital punishment in this State, it should be imposed in this case as to both Defendants given the facts and circumstances [*39] reflected in this record.

CONCLUSION

The sentence to be imposed as to Defendant Barnett and Defendant Barrow as to Counts I, IV and VII shall be death by lethal injection.

IT IS SO ORDERED.

TOLIVER, JUDGE

STATE OF DELAWARE,

Plaintiff,

v.

HECTOR S. BARROW,

Defendant.

IN97-02-1353, et seq.

MURDER FIRST DEGREE

I.D. NO. 9506017661

DEATH SENTENCE

As to IN97-02-1353, 1356 & 1359

In accordance with the laws of the State of Delaware as enacted by the General Assembly, it is the sentence of the Court that you shall be kept in the custody of the Department of Correction until Friday, the 15th day of May, 1998, and on that date, between the hours of 12:01 AM and 3:00 AM, shall be taken to some convenient place of private execution within the prison enclosure of the Delaware Correctional Center and then and there, in the presence of no more than ten witnesses summoned for that purpose, to include an adult member of the victim's immediate family as defined in 11 Del. C. § 4350(c), or his or her designee if a written request is made to the Commissioner by the Attorney General or the Attorney General's designee at least ten (10) days prior to the scheduled date [*40] of execution, you shall be injected intravenously with a substance or substances in a lethal quantity sufficient to cause death until you are dead, such procedure to be determined and supervised by the Commissioner of the Department of Correction.

You are hereby committed to the custody of the Department of Correction for the purpose of carrying out this sentence.

CHARLES H. TOLIVER, Judge

Date: February 3, 1998

STATE OF DELAWARE,

Plaintiff,

v.

JERMAINE BARNETT,

Defendant.

IN97-02-1328, et seq.

MURDER FIRST DEGREE

I.D. No. 9506017682

DEATH SENTENCE

As to IN97-02-1328, 1331 & 1334

In accordance with the laws of the State of Delaware as enacted by the General Assembly, it is the sentence of the Court that you shall be kept in the custody of the Department of Correction until Friday, the 22nd day of May, 1998, and on that date, between the hours of 12:01 AM and 3:00 AM, shall be taken to some convenient place of private execution within the prison enclosure of the Delaware Correctional Center and then and there, in the presence of no more than ten witnesses summoned for that purpose, to include an adult member of the victim's immediate family as defined in [*41] 11 Del. C. § 4350(c), or his or her designee if a written request is made to the Commissioner by the Attorney General or the Attorney General's designee at least ten (10) days prior to the scheduled date of execution, you shall be injected intravenously with a substance or substances in a lethal quantity sufficient to cause death until you are dead, such procedure to be determined and supervised by the Commissioner of the Department of Correction.

You are hereby committed to the custody of the Department of Correction for the purpose of carrying out this sentence.

CHARLES H. TOLIVER, Judge

Date: February 3, 1998



Not Reported in A.2d                                                          Page 1

Not Reported in A.2d, 2002 WL 88934 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
State v. BarrowDel.Super.,2002.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
STATE of Delaware, Plaintiff,
v.
Hector S. BARROW and Jermaine Barnett,
Defendants.

Jan. 4, 2002.

Defendants were convicted in the Superior Court,
New Castle County, of first-degree intentional
murder, felony murder, and other offenses, in
connection with killing during gun store robbery,
and were sentenced to death. Defendants appealed.
The Supreme Court, Walsh, J., 749 A.2d 1230,
affirmed in part and reversed in part. After a second
penalty hearing, the Superior Court, Toliver, J.,
held that life imprisonment, rather than death
penalty, was appropriate sentence.

Ordered accordingly.
West Headnotes
**Homicide 203 ⟞1572**

203 Homicide
    203XIV Sentence and Punishment
        203k1570 Life Sentence
            203k1572 k. Murder. Most Cited Cases
        (Formerly 203k354(2))
Life sentence, rather than death penalty, was
appropriate for defendants for first degree felony
murder, given that conviction for first degree
intentional murder and death penalty had been
overturned on appeal, where, without statement
ruled inadmissible on appeal, there was no evidence
of anything other than a homicide committed by
three participants during the course of two felonies
as charged, and, as a result of change in the
evidentiary and legal posture of the case, sentencing

court was unable to say beyond a reasonable doubt
which of the defendants did what or what
degree/level of culpability to assign to each
defendant. U.S.C.A. Const.Amend. 6.

FINDINGS AFTER SECOND PENALTY
HEARING
TOLIVER, J.
*1 This 4th day of January, 2002, it appears from
the record in this case:

*Procedural Posture*

1. A penalty hearing held on June 26 and 27, 2001
as a result of the reversal and remand by the
Delaware Supreme Court of this Court's decision to
impose the death penalty on both Defendants on
February 3, 1998. Because the facts and procedural
history are clearly outlined and have not changed up
to the date each was issued, that information will
not be repeated here with limited exception as
indicated below. Both opinions are, however,
incorporated by reference in their entirety herein as
Exhibits A & B.

2. Following the remand, the State elected not to
continue with the prosecution of the Murder First
Degree (Intentional) charge, but did indicate its
desire to proceed with the prosecution of the
Defendants on the remaining two counts of Murder
First Degree (Felony). The State then asked that the
Court proceed to hold a second penalty hearing
regarding the convictions of Murder First Degree
(Felony). Following the State's declaration of its
intentions, the parties asked the Court to hear the
matter without a jury and the Court agreed to do so.
The parties also agreed that by virtue of the felony
murder convictions, the statutory aggravating factor
required by 11 *Del. C.* § 4209(e) had been
established and that the record produced by the trial
and first penalty hearing, which were conducted
between April 17 and May 28, 1997, would be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2

Not Reported in A.2d, 2002 WL 88934 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

made a part of the second penalty hearing which was scheduled to begin on June 26, 2001. The lone exception was the statement by Lawrence Johnson the admission of which the Delaware Supreme Court had ruled was reversible error.

3. The parties filed with the Court notice of the aggravating and mitigating factors upon which each intended to rely on as required by 11 *Del. C.* § 4209(c). The State submitted the notice of the aggravating factors upon which it intended to rely on June 26. Counsel for Defendants Barnett and Barrow provided the requisite notice of the mitigating factors on June 25 and 27 respectively. The notices provided did not differ in any material way from that provided prior to the first penalty hearing.

4. The hearing began as scheduled and concluded that same day. The records from the trial and the first penalty hearing were entered into evidence as agreed. Additional testimony and evidence was also presented on behalf of both Defendants. At the conclusion of the hearing, the parties asked for and received the opportunity to summarize their arguments in writing. That process was completed on or about August 20, 2001.

*Findings of Fact*

5. After a careful review of the record as presently constituted, the Court continues to rely upon the findings and conclusions made in its February 3, 1998 decision as set forth in pages 1 thru 22. Stated differently, the State has met its burden and established the existence of the statutory aggravating factor as required by 11 *Del. C.* § 4209(e) as well as the existence of the additional aggravating factors as noticed. In addition, the Court again finds that both Defendants have established the existence of mitigating factors to the extent reflected in that opinion. The additional information provided at the second penalty hearing does not alter any of the conclusions reached. Rather, it only supports them.

*2 6. Notwithstanding the continued reliance upon those findings and conclusions, the process of

weighing the aggravating factors versus the mitigating factors found to exist as required by 11 *Del. C.* § 4209(d)(1)(b), now compels a different result.

*Weighing of Aggravating & Mitigating Factors*

7. In overturning the conviction for Murder First Degree (Intentional) and the death sentences imposed as a result of that conviction and the two convictions for Murder First Degree (Felony) arising out of the burglary/robbery of the Black Sheep Gun Shop, the Delaware Supreme Court made certain rulings which have altered the weighing process along with the sentence to be imposed. In relevant part, the Supreme Court held that this Court erred as a matter of law when it admitted the stipulation relative to the statement given by Defendant Johnson at trial and when it refused to allow Defendant Barnett to introduce evidence of his attempted cooperation with the police in identifying the shooter during the first penalty hearing.

8. In terms of the Johnson statement stipulation, the Supreme Court found that the underlying statement constituted inadmissible hearsay in that it was unreliable, violated the Confrontational Clause of the Sixth Amendment to the United States Constitution and that the error was not harmless. Our Supreme Court relied upon the then recent decision by the United States Supreme Court in *Lilly v.. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1998). *Barrow v. State*, Del.Supr., 749 A.2d 1230, 1244-1247. As to the evidence of Defendant Barnett's attempt to cooperate with the police, the Supreme Court held that its introduction during the first penalty phase was not prohibited by Delaware Rule of Evidence 410 as this Court opined. Nor was the statement hearsay because it was not admitted for its contents. Instead its introduction should have been allowed since the evidence might have impacted upon the jury's view of the level of Defendant Barnett's responsibility for the death of Thomas Smith. *Barrow*, 749 A.2d at 1248-1249.

9. As indicated above, the Supreme Court, based

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2002 WL 88934 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 3

upon the errors that it concluded had occurred, invalidated the Defendants' convictions and sentences for Murder First Degree (Intentional), and the sentences imposed for the two counts of Murder First Degree (Felony). The State would have to retry the case in its entirety as to the former if it elected to go forward with that charge. A new penalty phase would have to be conducted as to the latter notwithstanding the acknowledgment by the Supreme Court as to the difficulties in conducting a second joint penalty phase hearing. *Barrow,* 749 A.2d at 1250.

10. As counsel for the Defendants point out, the State relied upon the same evidence that was presented during the trial and the first penalty hearing. Consequently, without the Johnson statement, the there is no evidence of anything other than a homicide committed during the course of the two felonies as charged by three participants. This is particularly consequential in light of the State's decision not to continue with the prosecution of the intentional murder charge and Defendant Barnett's decision not to introduce his attempted cooperation with the State. It is true that there was one hearsay statement boasting of responsibility for the death of Thomas Smith attributed to Defendant Barrow. However, that statement was made by an individual who was not present during or otherwise charged as a result of the commission of the crimes in question, and the Supreme Court determined that its probative value was minimal at best. *Barrow,* 749 A.2d at 1246-1248.

*3 11. As a result of the change in the evidentiary and legal posture of the case following the Supreme Court's reversal and remand, this Court is unable to say beyond a reasonable doubt which of the Defendants, including Defendant Johnson, did what or to what degree/level of culpability to assign to each defendant. To impose the death penalty under such circumstances would run a foul of the decisions by the United States Supreme Court in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) as well the decisions of our Supreme Court following those decisions in *State v. Rodriguez,* Del.Supr., 659 A.2d 228 (1994) and other progeny. Simply

put, the weighing process mandated by 11 *Del. C.* § 4209(d)(1)(b) requires more before the scales of justice are tipped in favor of the death penalty. This is particularly true where, as the Supreme Court noted, one-third of the jury voted to impose a life sentence. *Barrow,* 749 A.2d at 1250.

12. Taking on additional weight and/or significance are Defendant Barnett's history of abusive treatment and lack of direction as does the lack of any prior criminal history on the part of Defendant Barrow. The Court must also consider the sentence imposed on Defendant Johnson who was also found guilty of the same felony murders and not guilty of the intentional murder involving Thomas Smith. As noted, Defendant Johnson received what constituted a life sentence after a separate trial. Finally, the Court must take note of what appears to be the adjustment made to prison by both Defendants since the initial imposition but prior to the Supreme Court's reversal in part of the convictions as well as since that event.

13. As this Court indicated in its February 3, 1998 opinion, this was a truly heinous crime. It had a disastrous and tragic impact upon the victim, Thomas Smith, and his family, as well as the families of the Defendants. Moreover, the Defendants have lost the ability to have any say in where or how they live. The best they could hope for is that they will die of natural causes as opposed to lethal injection. In its initial form following the trial and first penalty hearing, this Court indicated that if we are to have a death penalty, this was the case in which it should have been imposed. Since the posture of the case has changed, that conclusion no longer applies.[FN1]

> FN1. Although decided after the appeal of the Defendants in this case had been resolved, this Court also feels compelled to consider and be guided by the pronouncements of the Delaware Supreme Court in *Flonnory v. State,* Del.Supr., 778 A.2d 1044, 1050-1052 (2001). In that case, the Supreme Court evidenced its concern in enhancing the public's confidence in the impartial administration

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 4

Not Reported in A.2d, 2002 WL 88934 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

of justice in the retrial of capital cases.

In light of the foregoing, and after reviewing the evidence, making the statutorily required findings and weighing the factors found to exist following the decision of Delaware Supreme Court and the second penalty hearing, the Court concludes that the imposition of a life sentence in prison is the appropriate sentence to be imposed on both Defendants for the convictions of First Degree Murder (Felony) in Criminal Action Nos. IN97-02-1356 and IN97-02-1359 and IN97-02-1331 and IN97-02-1334. Those sentences will be imposed by separate order.

IT IS SO ORDERED.

Del.Super.,2002.
State v. Barrow
Not Reported in A.2d, 2002 WL 88934 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                        Page 1

Not Reported in A.2d, 2005 WL 3436609 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
State v. BarrowDel.Super.,2005.Only the Westlaw
citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
STATE of Delaware, Plaintiff,
v.
Hector S. BARROW and Jermaine Barnett,
Defendants.
Submitted Aug. 5, 2005.
Decided Dec. 6, 2005.

On the Defendants' Motions for Postconviction
Relief.

*OPINION AND ORDER*
TOLIVER, J.
*1 Before the Court is the Defendants' Motions for
Postconviction Relief which have been consolidated
for disposition. Upon consideration of the
Defendants' motions and the State's response, that
which follows is the Court's resolution of the issues
so presented.

*STATEMENT OF FACTS AND NATURE OF THE
PROCEEDINGS*

On June 25, 1995, Tom Smith, co-owner of Black
Sheep Sports, a business involving the buying and
selling of firearms, was killed during the robbery of
that store. Arrested shortly thereafter were Jermaine
Barnett, Hector Barrow, and Lawrence Johnson, all
from New York City, New York. Each was initially
indicted by the Grand Jury on August 7, 1995 and
charged with having committed Murder First
Degree/Intentional, Murder First
Degree/Felony-Recklessness, Murder First
Degree/Felony-Criminal Negligence, Robbery First
Degree, Burglary Second Degree, Conspiracy First
Degree, Conspiracy Second Degree and Possession
of a Firearm During the Commission of a Felony.

Barrow and Barnett were reindicted on February 18,
1997 for reasons unrelated to the legal viability of
the original indictment.

After a four-week trial, beginning April 17 and
concluding May 15, 1997, Barrow and Barnett were
convicted on all the above mentioned counts. The
first degree murder conviction resulted in the
imposition of death sentences.

On direct appeal, the Delaware Supreme Court
reversed the intentional murder convictions on the
basis that the admission of Johnson's redacted
statement violated the Defendants' right to confront
the witnesses against them as guaranteed by the
Sixth Amendment of the U.S. Constitution and
Article I, § 7 of the Delaware State Constitution.
Separate error was found in the Superior Court's
refusal to permit Barnett to present evidence of his
cooperation as mitigation in the penalty phase.
However, the Supreme Court did find that there was
sufficient evidence, absent the disputed statement,
to support the conviction of felony murder as to
both Barnett and Barrow. The affirmance of the
felony murder convictions required a new penalty
hearing because of the Confrontation Clause
violations.

The second penalty phase hearing was held June 26
though June 28, 2001. On January 4, 2002, after
reviewing the evidence and weighing all other
relevant factors, this Court imposed life sentences
on both Defendants for the convictions of felony
murder/first degree. The Defendants now seek relief
from the convictions and sentences.

Defendant Barrow, filed his motion for
postconvicton relief on January 27, 2005, pursuant
to Superior Court Criminal Rule 61 (hereinafter
referred to by rule only). Defendant Barnett, filed a
similar motion on January 31, 2005. Although filed
separately, these motions were consolidated for
disposition. The Defendants collectively claim that
they are entitled to the relief sought due to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 2

Not Reported in A.2d, 2005 WL 3436609 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

following: (1) ineffective assistance of counsel; (2) prosecutorial vouching and misconduct; (3) convictions against the legal weight of the evidence; (4) trial court bias and partiality; and (5) imposition of an illegal sentence. Defendant Barrow further argues that circumstances of his arrest violated the fourth amendment prohibition against warrantless searches and seizures.

**\*2** The State responded to the motions by letter dated August 4, 2005. It contends that the claims of ineffective assistance of counsel and trial court bias should fail because the Defendants make only general and conclusory assertions which fall short of meeting the requisite burden of proof. The claims of prosecutorial vouching and misconduct, convictions against the legal weight of evidence, and the illegal arrest of Barrow have been previously and extensively litigated thus barred by Rule 61 the State further argues. Lastly, the State contended that since the Supreme Court found sufficient independent evidence for the felony murder convictions, and the minimum sentence for such convictions is life imprisonment, the proper sentence was imposed.

### DISCUSSION

Before the Court can reach the merits of a motion for postconviction relief, the movant must overcome the substantial procedural bars contained in Rule 61(I).[FN1] Under Rule 61(I)(1), postconviction claims for relief must be brought within three years of the final conviction of the movant, unless the movant asserts a retroactively applicable Constitutional Right that is newly recognized.[FN2] Any ground for relief not asserted in a prior postconviction motion is thereafter barred unless consideration of the claim is necessary in the interest of justice.[FN3] Further, grounds for relief not asserted in the proceedings leading to judgment of conviction are thereafter barred, unless the movant demonstrates: (1) cause for procedural default, and (2) prejudice from any violation of the movant's rights.[FN4] Any ground for relief that was formerly adjudicated in the proceedings leading to judgment of conviction or in a prior postconviction proceeding is thereafter barred from consideration,

unless reconsideration of the claim is warranted in the interest of justice.[FN5]

> FN1. *Flamer v. State,* 585 A.2d 736, 745 (Del.1990); *Younger v. State,* 580 A.2d 552, 554 (Del.1990); *Saunders v. State,* 1995 WL 24888, at \*1 (Del.Supr.).

> FN2. Super. Ct.Crim. R. 61(I)(1). Note that the period within which to bring Rule 61 claims was changed from three years to one year, effective July 1, 2005. It applies to all cases where the judgment of conviction becomes final after that date.

> FN3. Super. Ct.Crim. R. 61(I)(2).

> FN4. Super. Ct.Crim. R. 61(I)(3).

> FN5. Super. Ct.Crim. R. 61(I)(4).

The procedural bars set forth in Rule 61(I)(1)-(3) may also be lifted where the defendant establishes a colorable claim that there has been a "miscarriage of justice" under Rule 61(I)(5). A colorable claim of "miscarriage of justice" occurs when there is a constitutional violation that undermines the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction.[FN6] This exception to the procedural bars is very narrow and is only applicable in very limited circumstances.[FN7] The defendant bears the burden of proving that he has been deprived of a "substantial constitutional right." [FN8] In this case, the Court must agree with the State and defense counsel that the petitions filed by the Defendants are without merit.

> FN6. Super. Ct.Crim. R. 61(I)(5).

> FN7. *Younger v. State,* 580 A.2d 552, 555 (Del.1990).

> FN8. *Id.*

The Defendants' motions are procedurally barred under Rule 61(I)(1) because they were filed "more

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 3

Not Reported in A.2d, 2005 WL 3436609 (Del.Super.)
(Cite as: Not Reported in A.2d)

than three years after the judgment of conviction [became] final." Because neither Defendant appealed his most recent sentence, those sentences became final on January 4, 2002. Since the Defendants do not claim that they are now entitled to the relief sought based on a retroactive application of a newly recognized constitutional right, their claims were barred as of January 3, 2005.

**\*3** The Defendants' claims of prosecutorial vouching and misconduct along with the contentions that their convictions against legal weight of evidence are barred under Rule 61(I)(4) because they were previously litigated before the Supreme Court in 2000 during the Defendants' appeal of their initial convictions. Likewise, Barrow's claim of an illegal arrest is barred under Rule 61(I)(4) because that issue was previously litigated in a suppression motion before the Superior Court and on direct appeal. Those claims having been litigated and final decisions rendered, this Court finds that the interests have been served and there is no miscarriage of justice which warrants any further review.

The Defendants' claims that an illegal sentence was imposed upon them are also barred by Rule 61(I)(4). As stated above the Supreme Court found sufficient evidence for the felony murder convictions independent of the disputed statement. The Defendants were subsequently sentenced to life sentences, the minimum sentence for such convictions. As a result, the interests of justice do not warrant a review of the claims by this Court, nor does the Court find a miscarriage of justice based on the assertions so presented.

The record is unclear as to whether the issues of the trial court's bias or partiality were fully litigated or even raised at all. If they were fully litigated and resolved they are indeed barred by Rule 61(I)(4). In the event that the claims were not raised at all, Rule 61(I)(2) prohibits raising them at this time. Further, the claims that the trial court was biased or partial were only supported by conclusory assertions. Accordingly, there is no interest of justice which would warrant further review of the claim, nor is the fairness or reliability of the proceedings in question which would justify review

under Rule 61(I)(5).

Under the standard outlined in *Strickland v. Washington,*[FN9] the Defendants must first demonstrate that counsel's representation fell below an objective standard of reasonableness if their claim of ineffective assistance of counsel is to prevail.[FN10] Second, they must show that counsel's actions were prejudicial to the defense, creating a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.[FN11] The *Strickland* standard is demanding and under the first prong of the test, there is a "strong presumption that the representation was professionally reasonable." [FN12] The Defendants must also "[o]vercome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." [FN13]

FN9. 466 U.S. 668 (1984).

FN10. *Id.* at 694.

FN11. *Id.*

FN12. *Stone v. State,* 690 A.2d 924, 925 (Del.1996); *Flamer* 585 A.2d at 753.

FN13. *Strickland,* 466 U.S. at 689.

The Defendants list various grounds in support of their claims of ineffective assistance of counsel, including counsels' failure to conduct a proper pretrial investigation and failure to provide an adequate defense. This Court's review of the record reveals that the investigation, which was crafted and conducted by the defense, resulted in the suppression of key State's evidence and the ultimate reversal of the intentional murder convictions that had previously resulted in death sentences. Simply put, defense counsels' efforts literally saved the Defendants' lives, thereby evidencing, that counsels' representation did not fall below an objective standard of reasonableness.

**\*4** The Defendants having failed to prove the first prong of the *Strickland* test, it not necessary to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 3436609 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

reach the second prong i.e., whether the defendants had been prejudiced by counsels' representation. Even if the Defendants had proven that defense counsel performed below the required standard, they have offered no credible evidence that the outcome of the trial would have been different or its integrity unchallenged if counsel had performed differently. Either way the result is the same.

*CONCLUSION*

In light of the foregoing, the Court concludes that the Defendants have failed to establish a basis upon which the relief sought can be granted. Therefore, the motions must be, and hereby are, dismissed.
IT IS SO ORDERED.

Del.Super.,2005.
State v. Barrow
Not Reported in A.2d, 2005 WL 3436609 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

905 A.2d 746                                                                                 Page 1

905 A.2d 746, 2006 WL 2371338 (Del.Supr.)
**(Cite as: 905 A.2d 746)**

**H**
Barnett v. StateDel.Supr.,2006.(The decision of the
Court is referenced in the Atlantic Reporter in a '
Table of Decisions Without Published Opinions.')
Supreme Court of Delaware.
Jermaine BARNETT, Defendant Below, Appellant,
v.
STATE of Delaware, Plaintiff Below, Appellee.
**No. 164,2006.**

Submitted: July 27, 2006.
Decided: Aug. 14, 2006.

Court Below-Superior Court of the State of
Delaware, in and for New Castle County, Cr. ID
No. 9506017682.

Before HOLLAND, BERGER and JACOBS,
Justices.

*ORDER*
CAROLYN BERGER, Justice.
*1 This 14th day of August 2006, upon
consideration of the notice to show cause, the
response to the notice to show cause filed by the
appellant, Jermaine Barnett, the State's
memorandum in support of dismissal, and Barnett's
response to the State's memorandum, it appears to
the Court that:

(1) By consolidated decision dated and docketed
December 6, 2005, the Superior Court denied
Jermaine Barnett's *pro se* motion for postconviction
relief. [FN1] Barnett filed a notice of appeal on
March 30, 2006.

> FN1. *See State v. Barrow,* 2005 WL
> 3436609 (Del.Super.Ct.) (denying motions
> for 1 postconviction relief filed by
> co-defendants Hector S. Barrow and
> Jermaine Barnett).

(2) An appeal from the Superior Court's denial of
postconviction relief must be filed "[w]ithin 30 days
after entry upon the docket of [the Superior Court's
decision]." [FN2] Barnett's notice of appeal indicated
on its face that it was, in fact, an untimely filing.

> FN2. Del.Supr. Ct. R. 6(a)(iii) (2006).

(3) On March 31, 2006, the Clerk issued a notice
directing that Barnett show cause why the appeal
should not be dismissed as untimely filed.[FN3]
Barnett responded that the appeal was untimely
because the Superior Court had failed to notify him
of the December 6, 2005 decision in a timely
manner. The record supports Barnett's contention
that the Superior Court failed to send him a copy of
the December 6, 2005 decision.[FN4]

> FN3. Del.Supr. Ct. R. 29(b) (2006).
>
> FN4. Barnett and his co-defendant
> proceeded *pro se* in the Superior Court.
> Nonetheless, neither Barnett nor his
> co-defendant is included in the distribution
> list on the front page of the December 6,
> 2005 decision.

(4) Barnett represents that he was not notified of the
December 6, 2005 decision until January 13, 2006,
when he received a Superior Court docket sheet that
he had requested from the Prothonotary. Upon
reviewing the docket sheet and realizing that the
Superior Court had issued a decision on his
postconviction motion, Barnett immediately sent a
letter to the Prothonotary and requested a copy of
the decision.

(5) Barnett contends that he waited for the
Prothonotary to respond to his request for a copy of
the decision. The Prothonotary did not respond.
Finally, after waiting more than two months,
Barnett filed the notice of appeal.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

905 A.2d 746                                                                                      Page 2

905 A.2d 746, 2006 WL 2371338 (Del.Supr.)
**(Cite as: 905 A.2d 746)**

(6) The time period within which to file a notice of appeal is mandatory and jurisdictional.[FN5] An untimely appeal cannot be considered unless the appellant demonstrates that the delay in filing the notice of appeal is attributable to court-related personnel.[FN6]

> FN5. *Carr v. State,* 554 A.2d 778, 779 (Del.1989).

> FN6. *Bey v. State,* 402 A.2d 362, 363 (Del.1979). 3

(7) Barnett contends that his delay in filing the notice of appeal is attributable to the Superior Court's failure to send him a copy of the December 6, 2005 decision followed by the Prothonotary's failure to comply with his request for a copy of the decision. Barnett requests that the Court accept his explanation for the untimely appeal and discharge the notice to show cause.

(8) The Court is constrained to deny Barnett's request. On similar facts in a previous case, we dismissed an untimely appeal when the appellant failed to file the notice of appeal within thirty days of receiving the Superior Court docket sheet.[FN7] We are unable to conclude that Barnett's case warrants different treatment.

> FN7. *Davis v. State,* 2000 WL 949647 (Del.Supr.); *see also In re 1989 GMC Sierra Pick-up Truck,* 1998 WL 382632 (Del.Supr.) (dismissing untimely appeal after appellant conceded that he was notified of the decision during a telephone conversation with court personnel).

(9) It was incumbent upon Barnett to file the notice of appeal within thirty days of January 13, 2006, the date he admittedly received the Superior Court's docket sheet that notified him that the court had ruled on his motion for postconviction relief. Unfortunately, after receiving that notice on January 13, 2006, Barnett waited seventy-six days before filing the notice of appeal.

*2 (10) Apparently, Barnett believed that he was required without exception to file the notice of appeal with a copy of the decision attached. The Supreme Court Rules expressly provide, however, that a decision on appeal does *not* have to be attached to a notice of appeal if the decision is unavailable.[FN8] Barnett could have filed his notice of appeal in a timely fashion with a statement indicating that the December 6, 2005 decision was unavailable. [FN9]

> FN8. *See* Del.Supr. Ct. R. 7(c)(9) (2006) (providing that a copy of the order on appeal, if available, shall be attached to the notice of appeal, "and if not available, a statement indicating such unavailability shall be included").

> FN9. *Cassidy v. State,* 1996 WL 376927 (Del.Supr.).

(11) The record does not reflect that court-related personnel prevented Barnett from filing his notice of appeal within thirty days of receiving the Superior Court's docket sheet. Under these circumstances, we are compelled to hold that Barnett's appeal was untimely filed.

NOW, THEREFORE, IT IS ORDERED, pursuant to Supreme Court Rule 29(b), that the appeal is DISMISSED.

Del.Supr.,2006.
Barnett v. State
905 A.2d 746, 2006 WL 2371338 (Del.Supr.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1

Not Reported in F.Supp.2d, 2002 WL 1774234 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Spencer v. SnyderD.Del.,2002.Only the Westlaw
citation is currently available.
United States District Court, D. Delaware.
Jesse L. SPENCER, Petitioner,
v.
Robert SNYDER, Warden, and Attorney General of
the State of Delaware, Respondents.
**No. CIV.A. 00-898-SLR.**

July 24, 2002.

Following conviction of assault, robbery, burglary,
kidnaping, and four counts of possession of a
deadly weapon during the commission of a felony,
inmate appealed. On direct appeal, 682 A2d 627,
the Supreme Court affirmed. Denying habeas, the
District Court, Robinson, J., held that: (1) statute of
limitations began running when inmate's conviction
became final, and thus inmate's petition was
untimely; (2) statute of limitations was not
statutorily tolled; and (3) inmate failed to establish
any extraordinary circumstances that prevented him
from filing his writ of habeas corpus in a timely
manner, and thus equitable tolling did not apply.

Dismissed.
West Headnotes
**[1] Habeas Corpus 197 ⇒603**

197 Habeas Corpus
     197III Jurisdiction, Proceedings, and Relief
          197III(A) In General
               197k603 k. Laches or Delay. Most Cited
Cases
A pro se prisoner's habeas petition is deemed filed
on the date he delivers it to prison officials for
mailing to the district court, not on the date the
district court dockets it.

**[2] Habeas Corpus 197 ⇒603**

197 Habeas Corpus

197III Jurisdiction, Proceedings, and Relief
     197III(A) In General
          197k603 k. Laches or Delay. Most Cited
Cases
One-year statute of limitations applicable to federal
habeas corpus petitions under Antiterrorism and
Effective Death Penalty Act (AEDPA) began
running when inmate's conviction became final, and
thus inmate's habeas corpus petition was untimely
where inmate filed four years after date conviction
became final. 28 U.S.C.A. §§2244(d)(1), (d)(2).

**[3] Habeas Corpus 197 ⇒603**

197 Habeas Corpus
     197III Jurisdiction, Proceedings, and Relief
          197III(A) In General
               197k603 k. Laches or Delay. Most Cited
Cases
One-year statute of limitations applicable to federal
habeas corpus petitions under Antiterrorism and
Effective Death Penalty Act (AEDPA) was not
statutorily tolled by inmate's application for
postconviction relief where inmate's application was
filed after the expiration of the one-year limitations
period. 28 U.S.C.A. §2244(d)(2).

**[4] Habeas Corpus 197 ⇒603**

197 Habeas Corpus
     197III Jurisdiction, Proceedings, and Relief
          197III(A) In General
               197k603 k. Laches or Delay. Most Cited
Cases
Inmate failed to establish any extraordinary
circumstances that prevented him from filing his
writ of habeas corpus in a timely manner, and thus,
equitable tolling of one-year statute of limitations
applicable to federal habeas corpus petitions under
Antiterrorism and Effective Death Penalty Act
(AEDPA) did not apply; inmate failed to offer any
explanation for delay, and even acknowledged that
he did not file petition within limitations period. 28
U.S.C.A. §2244(d)(2).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2

Not Reported in F.Supp.2d, 2002 WL 1774234 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Jesse L. Spencer, Delaware Correctional Center, Smyrna, Delaware. Petitioner, pro se.
Loren C. Meyers, Esquire, Chief of Appeals Division, Delaware Department of Justice, Wilmington, Delaware. Counsel for Respondents.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

*1 Petitioner Jesse L. Spencer is a state inmate in custody at the Delaware Correctional Center in Smyrna, Delaware. Currently before the court is petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.I.2) For the reasons that follow, the court concludes that petitioner's application is time barred by the one-year period of limitation prescribed in 28 U.S.C. § 2244(d)(1). Accordingly, the court will dismiss the petition as untimely.

II. BACKGROUND

Following a jury trial in the Delaware Superior Court, petitioner was convicted of assault, robbery, burglary, kidnaping, and four counts of possession of a deadly weapon during the commission of a felony. The Superior Court sentenced petitioner on September 22, 1995, to 103 years imprisonment, suspended after 100 years for decreasing levels of supervision. On direct appeal, the Delaware Supreme Court affirmed. *Spencer v. State,* No. 417, 1995, 1996 WL 415919 (Del. July 17, 1996).

Three years later, on July 16, 1999, petitioner filed in the Superior Court a motion for postconviction relief pursuant to Rule 61 of the Superior Court Rules of Criminal Procedure. The Superior Court summarily dismissed the motion. *State v. Spencer,* No. 9402009418, 1999 WL 743314 (Del.Super.Ct. Aug.3, 1999). The Delaware Supreme Court dismissed petitioner's postconviction appeal as untimely. *Spencer v. State,* No. 407, 1999, 1999 WL 971069 (Del. Oct.4, 1999).

Petitioner's application for federal habeas relief is now before the court.

III. DISCUSSION

A. One-Year Period of Limitation

In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress amended the federal habeas statute by prescribing a one-year period of limitation for the filing of habeas petitions by state prisoners. *Stokes v. District Attorney of County of Philadelphia,* 247 F.3d 539, 541 (3d Cir.) , *cert. denied,* 534 U.S. 959, 122 S.Ct. 364, 151 L.Ed.2d 276 (2001). Effective April 24, 1996, the AEDPA provides:
(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review ...

28 U.S.C. § 2244(d)(1).

As described above, the Delaware Supreme Court affirmed petitioner's conviction and sentence on July 17, 1996. Petitioner was then allowed ninety days in which to file a petition for a writ of certiorari with the United States Supreme Court. *See* Sup.Ct. R. 13.1. Although petitioner did not seek review from the United States Supreme Court, the ninety-day period in which he could have filed such a petition is encompassed within the meaning of " the expiration of the time for seeking [direct] review, " as provided in § 2244(d)(1)(A). *See Kapral v. United States,* 166 F.3d 565, 576 (3d Cir.1999) (holding that on direct review, the limitation period begins to run at the expiration of the time for seeking review in the United States Supreme Court). Therefore, petitioner's conviction became final on October 15, 1996, ninety days after the Delaware Supreme Court affirmed his conviction and sentence.

*2 [1] The court's docket reflects that the current petition was filed on October 13, 2000. (D.I.2) A pro se prisoner's habeas petition, however, is deemed filed on the date he delivers it to prison officials for mailing to the district court, not on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3

Not Reported in F.Supp.2d, 2002 WL 1774234 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

date the district court dockets it. *Burns v. Morton,* 134 F.3d 109, 113 (3d Cir.1998). Petitioner has provided the court with no documentation establishing the date he delivered his petition to prison officials for mailing. The petition itself, however, is dated September 29, 2000. (D.I.2) In the absence of proof respecting the date of delivery, the court deems the petition filed on September 29, 2000. *See Murphy v. Snyder,* Civ. A. No. 98-415-JJF, at 4 (D.Del. Mar. 8, 1999).

[2] In short, the one-year period began running when petitioner's conviction became final on October 15, 1996. His habeas petition was filed nearly four years later on September 29, 2000. That, however, does not necessarily require dismissal of the petition as untimely, because the one-year period is subject to statutory and equitable tolling. *See Jones v. Morton,* 195 F.3d 153, 158 (3d Cir.1999).

### B. Statutory Tolling

The AEDPA provides for statutory tolling of the one-year period of limitation as follows:
The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

[3] Here, petitioner filed a motion for postconviction relief in the Superior Court on July 16, 1999. The one-year period of limitation, however, expired on October 15, 1997, one year after his conviction became final. Petitioner's motion for postconviction relief, filed long after the one-year period expired, has no tolling effect in this matter. *See Fisher v. Gibson,* 262 F.3d 1135, 1142-43 (10th Cir.2001)(stating that application for postconviction relief filed after the expiration of the one-year period has no tolling effect); *cert. denied,* 535 U.S. 1034, 122 S.Ct. 1789, 152 L.Ed.2d 649 (2002); *Collingwood v. Snyder,* Civ. A. No. 00-783-SLR, 2002 WL 1446702, *3 (D.Del. June 28, 2002)(same).

In sum, petitioner filed his motion for postconviction relief after the one-year period of limitation had expired. The court thus concludes that the statutory tolling provision does not apply.

### C. Equitable Tolling

Additionally, the one-year period of limitation may be equitably tolled. *Fahy v. Horn,* 240 F.3d 239, 244 (3d Cir.), *cert. denied,* 534 U.S. 944, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001); *Jones,* 195 F.3d at 159; *Miller v. New Jersey State Dep't of Corr.,* 145 F.3d 616, 618 (3d Cir.1998). The doctrine of equitable tolling applies
only when the principles of equity would make the rigid application of a limitation period unfair. Generally, this will occur when the petitioner has in some extraordinary way been prevented from asserting his or her rights. The petitioner must show that he or she exercised reasonable diligence in investigating and bringing [the] claims. Mere excusable neglect is not sufficient.

*3 *Miller,* 145 F.3d at 618-19 (citations omitted). In other words, equitable tolling "may be appropriate if (1) the defendant has actively misled the plaintiff, (2) if the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." *Jones,* 195 F.3d at 159 (quoting *United States v.. Midgley,* 142 F.3d 174, 179 (3d Cir.1998)).

[4] In the instant case, petitioner has failed to articulate any extraordinary circumstances that prevented him from filing his petition with this court in a timely manner. Indeed, he has failed to offer any explanation for the delay, and even acknowledges that he "has not filed his petition within the statutory provision of § 2244(d)(1)." (D.I.18, ¶ 5) Moreover, the court has independently reviewed the record, and can discern no extraordinary circumstances that warrant applying equitable tolling. Accordingly, the court will dismiss the petition as time barred.

### IV. CERTIFICATE OF APPEALABILITY

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2002 WL 1774234 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Finally, the court must determine whether a certificate of appealability should issue. *See* Third Circuit Local Appellate Rule 22.2. The court may issue a certificate of appealability only if petitioner " has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

When a federal court dismisses a habeas petition on procedural grounds without reaching the underlying constitutional claims, the petitioner must demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

As discussed above, the court has concluded that the current habeas petition is time barred, and that neither the statutory tolling provision nor the doctrine of equitable tolling applies. The court is persuaded that reasonable jurists would not debate the correctness of these conclusions. Petitioner, therefore, has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability is not warranted.

### V. CONCLUSION

For the reasons stated, the court will dismiss petitioner's application for a writ of habeas corpus, and will not issue a certificate of appealability. An appropriate order shall issue.

D.Del.,2002.
Spencer v. Snyder
Not Reported in F.Supp.2d, 2002 WL 1774234 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00898 (Docket) (Oct. 13, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2001 WL 1555239 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Thomas v. SnyderD.Del.,2001.Only the Westlaw
citation is currently available.
United States District Court, D. Delaware.
Kevin A. THOMAS, Petitioner,
v.
Robert W. SNYDER, Warden, and Attorney
General of the State of Delaware, Respondents.
**No. CIV.A. 98-597-GMS.**

Nov. 28, 2001.

MEMORANDUM AND ORDER
SLEET, District J.
*1 Kevin A. Thomas was convicted of first degree
murder and possession of a deadly weapon during
the commission of a felony. He is presently
incarcerated in the Delaware Correctional Center in
Smyrna, Delaware, where he is serving a sentence
of life imprisonment. Thomas has filed with this
court a petition for a writ of habeas corpus pursuant
to 28 U.S.C. § 2254. As explained below, the court
will dismiss Thomas' petition as time barred by the
one-year period of limitation prescribed in 28
U.S.C. § 2244(d).

I. BACKGROUND

On June 28, 1993, following a jury trial in the
Delaware Superior Court, Kevin A. Thomas was
convicted of first degree murder and possession of a
deadly weapon during the commission of a felony.
The evidence at trial demonstrated that on
September 13, 1992, Thomas shot David Turner in
the face and killed him. Thomas was seventeen
years old at the time. He was sentenced to life in
prison without parole on the murder conviction and
to a consecutive sentence of five years in prison on
the weapons conviction. The Delaware Supreme
Court affirmed Thomas' conviction and sentence on
September 21, 1994.

On December 18, 1996, Thomas filed in state court
a motion for post-conviction relief pursuant to Rule
61 of the Delaware Superior Court Criminal Rules.
The trial court summarily dismissed Thomas' Rule
61 motion on December 23, 1996. Thomas
appealed to the Delaware Supreme Court. His
subsequent motion to withdraw the appeal was
granted on March 11, 1997. Thomas filed a second
Rule 61 motion for post-conviction relief on March
27, 1997, which was summarily dismissed on May
9, 1997. Again, Thomas appealed to the Delaware
Supreme Court. The Court affirmed the order of
dismissal on November 24, 1997.

Thomas has now filed with this court the current
petition for a writ of habeas corpus pursuant to 28
U.S.C. § 2254. In his petition Thomas articulates
four separate grounds for relief: (1) The searches of
his residence and car were in violation of the Fourth
Amendment, and all evidence seized from these
searches should have been suppressed; (2) The trial
court erred in admitting identification testimony that
was the result of an impermissibly suggestive
photographic identification procedure; (3) The trial
court violated his constitutional right to due process
by giving a supplemental jury instruction pursuant
to *Allen v. United States,* 164 U.S. 492 (1896); and
(4) His constitutional rights were violated when
police questioned him without a parent or legal
guardian present. The respondents argue that the
petition is subject to a one-year period of limitation
that expired before Thomas filed it. Thus, they
request that the court dismiss the petition as time
barred.

II. DISCUSSION

A. One-Year Period of Limitation

In the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"), Congress amended the
federal habeas statute by prescribing a one-year

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2

Not Reported in F.Supp.2d, 2001 WL 1555239 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

period of limitation for the filing of § 2254 habeas petitions by state prisoners. *Stokes v. District Attorney of the County of Philadelphia,* 247 F.3d 539, 541 (3d Cir.2001). Effective April 24, 1996, the AEDPA provides:

**\*2** (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review....

28 U.S.C. § 2244(d)(1). In order to avoid any impermissible retroactive application of the one-year period of limitation, state prisoners whose convictions became final prior to the enactment of the AEDPA were allowed to file their § 2254 petitions no later than April 23, 1997. *See Burns v. Morton,* 134 F.3d 109, 111 (3d Cir.1998) (prohibiting dismissal of petitions filed on or before April 23, 1997, as untimely under § 2244(d)(1)(A)).

Thomas' conviction became final prior to the enactment of the AEDPA. He was convicted on June 28, 1993. The Delaware Supreme Court affirmed the judgment of conviction on September 21, 1994. Thomas was then allowed ninety days in which to file a petition for a writ of certiorari with the United States Supreme Court. *See* Supreme Court Rule 13. Although Thomas did not file a petition with the United States Supreme Court, the ninety-day period in which he could have filed such a petition is encompassed within the meaning of " the conclusion of direct review or the expiration of the time for seeking such review," as set forth in § 2244(d)(1)(A). *See Kapral v. United States,* 166 F.3d 565, 576 (3d Cir.1999)(holding that on direct review, the limitation period of § 2244(d)(1)(A) begins to run at the expiration of the time for seeking review in the United States Supreme Court). Therefore, Thomas' conviction became final on December 20, 1994, ninety days after the Delaware Supreme Court affirmed his conviction, and well before the enactment of the AEDPA on April 24, 1996. Thus, he could have filed a timely habeas petition with this court not later than April 23, 1997. *See Burns,* 134 F.3d at 111.

Ascertaining the precise date Thomas filed his habeas petition with the court is somewhat problematic. The court's docket reflects that the petition was filed on October 21, 1998, the date the clerk's office received his petition and filing fee. A pro se prisoner's habeas petition, however, is considered filed on the date he delivers it to prison officials for mailing to the district court, not on the date the court receives it. *Id.* at 113. Thomas has provided the court with no documentation establishing the date he delivered his petition to prison officials for mailing. The petition itself, however, is dated August 10, 1998. The respondents maintain that the filing date is October 8, 1998, but they provide no documentation to support this conclusion. Under these circumstances, the court will extend Thomas every benefit of the doubt and will consider his habeas petition filed on August 10, 1998, the earliest possible date he could have delivered it to prison officials for mailing.

**\*3** Obviously Thomas' habeas petition was filed well beyond the April 23, 1997 deadline. That, however, does not end the inquiry because § 2244(d) 's period of limitation may be either statutorily or equitably tolled. *See Jones v. Morton,* 195 F.3d 153, 158 (3d Cir.1999).

### B. Statutory Tolling

The AEDPA provides for statutory tolling of the one-year period of limitation:

The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(2).

Thomas filed in state court a Rule 61 motion for post-conviction relief on December 18, 1996, which the Superior Court summarily dismissed on December 23, 1996. As previously noted, Thomas appealed from the order of dismissal. His subsequent motion to withdraw the appeal was granted on March 11, 1997. The respondents concede, and correctly so, that the filing of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1555239 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

motion for post-conviction relief tolled the period of limitation. Thus, the period of time from December 18, 1996, through March 11, 1997, does not count toward the one-year period of limitation. FN1

> FN1. The court notes that the one-year period is tolled during the time between the Superior Court's dismissal of Thomas' Rule 61 motion and his timely appeal to the Delaware Supreme Court. *See Swartz v. Meyers,* 204 F.3d 417, 420 (3d Cir.2000)

Thomas filed a second Rule 61 motion for post-conviction relief in state court on March 27, 1997, which was summarily dismissed on May 9, 1997. The Delaware Supreme Court affirmed the dismissal on November 24, 1997. Again, the respondents concede that the filing of the second Rule 61 motion tolled the period of limitation.FN2 Thus, the period of time from March 27, 1997, through November 24, 1997, is excluded from the one-year limitation period. FN3

> FN2. Only a "properly filed application" for post-conviction review tolls the one-year period under § 2244(d)(2). Whether Thomas' second Rule 61 motion constitutes a "properly filed application" is subject to debate. Under Rule 61, "[a]ny ground for relief that was not asserted in a prior postconviction proceeding ... is thereafter barred." Super. Ct. R.Crim. P., Rule 61(i)(2). This procedural bar, however, is inapplicable where a motion raises "a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction." *Id.,* Rule 61(i)(5). The court need not, and does not, address whether Thomas' second Rule 61 motion was a "properly filed application" because the respondents concede that the one-year period was

tolled while the second Rule 61 motion was pending. Regardless, as discussed herein, Thomas' habeas petition is untimely.

> FN3. Thomas could have filed, but did not file, a petition for a writ of certiorari with the United States Supreme Court within ninety days of the Delaware Supreme Court's order. *See* Supreme Court Rule 13. As explained above, on direct review that ninety-day period is excluded from the one-year period of limitation. *See Kapral,* 166 F.3d at 576. In post-conviction proceedings, however, the time during which a state prisoner may file a petition in the United States Supreme Court does *not* toll the one-year period, and the ninety-day period is counted. *Stokes,* 247 F.3d at 543.

Nonetheless, since the date of the enactment of AEDPA, more than one year has passed during which statutory tolling does not apply. First, from April 24, 1996, through December 17, 1996, a period of 238 days, no post-conviction proceedings were pending, and those 238 days are included as part of the one-year period. In addition, from March 12, 1997, through March 26, 1997, no post-conviction relief proceedings were pending, and those fourteen days must be counted. Finally, from November 25, 1997, through August 9, 1998, a period of 258 days, no motion for post-conviction relief was pending, and those 258 days must be counted.

In sum, following the enactment of the AEDPA, 510 days lapsed during which Thomas had no post-conviction proceedings pending for purposes of § 2244(d)(2). This period of time, well in excess of one year, must be counted. The court thus concludes that while the statutory tolling provision applies to certain portions of time since the enactment of the AEDPA, it does not render Thomas' habeas petition timely filed.

### C. Equitable Tolling

Additionally, the one-year period of limitation prescribed in § 2244(d) may be subject to equitable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4

Not Reported in F.Supp.2d, 2001 WL 1555239 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

tolling. *Fahy v. Horn,* 240 F .3d 239, 244 (3d Cir.2001); *Jones,* 195 F.3d at 159; *Miller v. New Jersey State Dep't of Corrections,* 145 F.3d 616, 618 (3d Cir.1998). The doctrine of equitable tolling applies:

**\*4** only when the principles of equity would make the rigid application of a limitation period unfair. Generally, this will occur when the petitioner has in some extraordinary way been prevented from asserting his or her rights. The petitioner must show that he or she exercised reasonable diligence in investigating and bringing [the] claims. Mere excusable neglect is not sufficient.

*Miller,* 145 F.3d at 618-19 (citations omitted). In other words, equitable tolling "may be appropriate if (1) the defendant has actively misled the plaintiff, (2) the plaintiff has 'in some extraordinary way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum." *Jones,* 195 F.3d at 159, *quoting United States v.. Midgley,* 142 F.3d 174, 179 (3d Cir.1998).

In the instant case, Thomas argues that the AEDPA's one-year period of limitation is at odds with the three-year period allowed for filing a Rule 61 motion for post-conviction relief. He contends that because Delaware allows three years in which to file a Rule 61 motion, and petitioners are required to exhaust state remedies before filing habeas petitions in federal court, it is unfair to apply the AEDPA's one-year period of limitation, rather than Delaware's three-year period.

Although Thomas is correct that Delaware generally allows three years in which to file a Rule 61 motion, *see* Super. Ct. R.Crim. P., Rule 61(i)(1), the court is unimpressed by his equitable tolling argument. As explained above, the court has applied § 2244(d)(2) 's tolling provision to exclude the periods of time during which his two post-conviction proceedings were pending before the state courts. These periods of time do not count against Thomas. There is nothing unfair or inequitable in applying the AEDPA's one-year period of limitation to petitioners who wait more than a year before filing a habeas petition in federal court, even if the Delaware rule permits a longer period of time in

which to file Rule 61 motions.

More important, Thomas has failed to articulate any extraordinary circumstances that prevented him from filing his habeas petition with this court in a timely manner. Indeed, he has failed to offer *any* explanation for the delay. He has not provided the court with any reason why, after the AEDPA was enacted, he waited until December 18, 1996, to file his first Rule 61 motion. He has not explained why, after his second Rule 61 proceedings were completed on November 24, 1997, he waited until August 10, 1998, to file his habeas petition with this court.

In short, the court cannot discern any extraordinary circumstances that warrant applying the doctrine of equitable tolling. Thomas' habeas petition will be dismissed as untimely.

### D. Motion for Appointment of Counsel

In a letter to the court dated April 16, 2000, Thomas inquired respecting appointment of counsel in this matter. The court construes this letter as a motion for appointment of counsel. The Sixth Amendment right to counsel does not extend to habeas proceedings. *See Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987); *United States v. Roberson,* 194 F.3d 408, 415 n. 5 (3d Cir.1999). Additionally, the court has determined that Thomas' habeas petition will be dismissed as untimely. Accordingly, Thomas' letter dated April 16, 2000, construed as a motion for appointment of counsel, will be denied as moot.

### III. CERTIFICATE OF APPEALABILITY

**\*5** Finally, the court must determine whether a certificate of appealability should issue. *See* Third Circuit Local Appellate Rule 22.2. The court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

When the court denies a habeas petition on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 5

Not Reported in F.Supp.2d, 2001 WL 1555239 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

procedural grounds without reaching the underlying constitutional claim, the prisoner must demonstrate that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

For the reasons discussed above, Thomas' habeas petition is barred by the one-year period of limitation. The court cannot conclude that the period should be statutorily or equitably tolled to render the petition timely. The court is convinced that reasonable jurists would not debate otherwise. Thomas therefore cannot make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not issue.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT:
1. Thomas' petition for a writ of habeas corpus pursuant to 28 U .S.C. § 2254 is DISMISSED, and the relief requested therein is DENIED.
2. Thomas' letter dated April 16, 2000, requesting appointment of counsel, is construed as a motion for appointment of counsel, and so construed, is DENIED as moot.
3. The court declines to issue a certificate of appealability for failure to satisfy the standard set forth in 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

D.Del.,2001.
Thomas v. Snyder
Not Reported in F.Supp.2d, 2001 WL 1555239 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.